1  EILEEN R. RIDLEY, CA Bar No. 151735
    eridley@foley.com
2  JASON Y. WU, CA Bar No. 313368
    jwu@foley.com
3  **FOLEY & LARDNER LLP**
  555 CALIFORNIA STREET, SUITE 1700
4  SAN FRANCISCO, CA 94104-1520
  TELEPHONE:  415.434.4484
5  FACSIMILE:  415.434.4507

6  KALEB N. BERHE, CA Bar No. 302080
    kberhe@foley.com
7  **FOLEY & LARDNER LLP**
  555 SOUTH FLOWER STREET, SUITE 3300
8  LOS ANGELES, CA 90071-2411
  TELEPHONE:  213.972.4500
9  FACSIMILE:   213.486.0065

10  Attorneys for Defendant JUUL LABS,
   INC.

11

12          **UNITED STATES DISTRICT COURT**

13        **NORTHERN DISTRICT OF CALIFORNIA**

14

15  MARIA DE LA LUZ BAUTISTA-PEREZ, LUZ
  PEREZ BAUTISTA and SALVADORA
16  CORREA, on behalf of themselves and all others
  similarly situated,
17
                  Plaintiffs,
18
19         vs.
20  JUUL LABS, INC., COALITION FOR
  REASONABLE VAPING REGULATION,
21  LONG YING INTERNATIONAL, INC.,
  DAVID M. HO, and DOES 1-10 inclusive,
22
              Defendants.

Case No. 4:20-cv-01613-HSG

**DEFENDANT JUUL LABS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Dept.: Courtroom 2, 4th Floor
Date: April 29, 2021
Time: 2:00 p.m.

Hon. Haywood S. Gilliam, Jr.
Action Filed: March 4, 2020
Trial Date: None Set

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 29, 2021 at 2:00 p.m., or as soon thereafter as this matter may be heard in Courtroom 2, 4th Floor of the above-captioned Court, located at 1301 Clay Street, Oakland, CA 94612, Defendant Juul Labs, Inc. ("JLI") will, and hereby does, move this Court for an order dismissing with prejudice the Second Amended Complaint ("SAC"), and each and every cause of action asserted therein, filed by Plaintiffs Maria de la Luz Perez Bautista, Luz Perez Bautista, and Salvadora Correa ("Plaintiffs") as to JLI.

This Motion is made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the SAC fails to state any plausible claim for relief against JLI under any theory of recovery, and that the SAC should therefore be dismissed with prejudice as to JLI in its entirety. JLI's Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the pleadings and records on file in this action, and such additional authority and argument as may be presented at the hearing on this Motion.

Date: February 2, 2020

**FOLEY & LARDNER LLP**
Eileen R. Ridley
Jason Y. Wu
Kaleb N. Berhe

*/s/ Eileen R. Ridley*
Eileen R. Ridley
Attorneys for Defendant JUUL LABS, INC.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................... 1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................ 2

III.  FACTUAL BACKGROUND ......................................................... 2

    A.  ALLEGATIONS RELATING TO PRE-CAMPAIGN ACTIVITY ... 2

    B.  ALLEGATIONS RELATING TO CAMPAIGN ACTIVITY ............ 4

IV.  ARGUMENT ............................................................................... 6

    A.  LEGAL STANDARD ............................................................... 6

    B.  THE SAC FAILS TO ALLEGE ANY BASIS FOR LIABILITY AGAINST JLI. ... 7

        1.  The SAC Does Not Pursue a Theory of Direct Employment Against JLI. ... 7

        2.  Plaintiffs Cannot Viably Allege That JLI Is a Joint Employer of the Campaign Workers. ... 7

        3.  The SAC Fails to Allege that JLI Is Liable as a "Client Employer" Under Cal. Labor Code § 2810.3. ... 14

    C.  THE SAC FAILS TO ALLEGE THAT JLI IS LIABLE AS AN ALTER EGO OF CRVR. ... 15

        1.  Alter Ego Liability Has No Applicability to the Allegations of this Case. ... 16

        2.  Even if the Alter Ego Doctrine Applied, the SAC Fails to Plead its Elements. ... 17

        3.  Even if CRVR Were an Alter Ego of JLI, the SAC Still Fails as to JLI. ... 21

    D.  PLAINTIFFS' UCL CLAIM SEEKS REMEDIES UNAVAILABLE AS A MATTER OF LAW. ... 22

    E.  THE SECOND AMENDED COMPLAINT FAILS TO PLAUSIBLY PLEAD INDIVIDUAL OR ENTERPRISE COVERAGE UNDER THE FLSA ... 24

V.  CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Asghari v. Volkswagen Grp. of Am., Inc.*,
    42 F. Supp. 3d 1306 (C.D. Cal. 2013) .................................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................................6, 8, 20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................................6

*Channell Commercial Corp. v. Wilmington Mach., Inc.*,
    No. EDCV142240DMGDTBX, 2016 WL 7638179 (C.D. Cal. July 5, 2016)...................15

*Citizens United v. Federal Election Commission*,
    558 U.S. 310 (2010)...............................................................................................................17

*EchoStar Satellite Corp. v. NDS Grp. PLC*,
    No. SACV-03-0950DOCJTLX, 2008 WL 4596644 (C.D. Cal. Oct. 15, 2008)................23

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ..................................................................................................6

*Everflow Tech. Corp. v. Millennium Elecs., Inc.*,
    No. C07-05795 HRL, 2013 WL 5132751 (N.D. Cal. Sept. 13, 2013) ................................20

*Gerritsen v. Warner Bros. Entm't Inc.*,
    112 F. Supp. 3d 1011 (C.D. Cal. 2015) ..............................................16, 17, 18, 19, 20, 21

*In re Gilead Scis. Sec. Litig.*,
    No. C 03-4999 SI, 2009 WL 1561584 (N.D. Cal. June 3, 2009)..........................................8

*Katz v. DNC Servs. Corp.*,
    No. CV 16-5800, 2019 WL 4752056 (E.D. Pa. Sept. 27, 2019) ............................12, 13, 17

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .............................................................................................4, 6

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
    628 F.2d 1175 (9th Cir. 1980) ..........................................................................................16, 19

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ..................................................................................................6

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ..................................................................................................4

*Mossimo Holdings LLC v. Haralambus*,
  No. CV 14-05912 DDP JEMX, 2015 WL 476298, at *3 (C.D. Cal. Feb. 3, 2015) ...........................16

*Neilson v. Union Bank of California, N.A.*,
  290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..................................................................................20, 21

*Revolorio v. C&R Canoga Park*,
  No. CV0904572ODWRZX, 2010 WL 11515195 (C.D. Cal. Jan. 20, 2010) ...................................24

*Simonyan v. Ally Fin. Inc.*,
  2013 WL 45453 (C.D. Cal. Jan.3, 2013) ........................................................................................8

*Solis v. City of Fresno*,
  2012 WL 868681 (E.D. Cal. Mar.13, 2012) ...................................................................................8

*United States v. Pangang Grp. Co.*,
  879 F. Supp. 2d 1052 (N.D. Cal. 2012) ...................................................................................16, 19

*Valencia v. N. Star Gas Co.*,
  291 F. Supp. 3d 1155 (S.D. Cal. 2018) ........................................................................................10

*Vitale & Assocs., LLC v. Lowden*,
  No. 2:12-CV-1400-JAD-VCF, 2015 WL 4603471 (D. Nev. July 30, 2015), *aff'd*, 690 F. App'x 555
  (9th Cir. 2017) .............................................................................................................................17

*Webber v. Deck*,
  433 F. Supp. 3d 237 (D.N.H. 2020) ..............................................................................................17

*Yan v. Gen. Pot, Inc.*,
  78 F. Supp. 3d 997 (N.D. Cal. 2015) ............................................................................................24

**California Cases**

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992) ..................................................................................................................22

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ..................................................................................................................22

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal. App. 4th 663 (2006) .......................................................................................................23

*Curry v. Equilon Enterprises, LLC*,
  23 Cal. App. 5th 289 (2018) ...................................................................................................11, 13

*Doney v. TRW, Inc.*,
  33 Cal. App. 4th 245 (1995) .........................................................................................................16

*Dynamex Operations W. v. Superior Court*,
  4 Cal. 5th 903 (2018) .....................................................................................................................7

TABLE OF AUTHORITIES
Case No. 4:20-cv-01613-HSG

*Futrell v. Payday California, Inc.*,
  190 Cal. App. 4th 1419 (2010) .................................................................................9

*Henderson v. Equilon Enterprises, LLC*,
  40 Cal. App. 5th 1111 (2019) ..........................................................................7, 13, 14

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ...............................................................................22, 23, 24

*Martinez v. Combs*,
  49 Cal. 4th 35 (2010) ..............................................................7, 8, 9, 11, 13, 14, 15

*Misik v. D'Arco*,
  197 Cal. App. 4th 1065 (2011), *as modified* (Aug. 9, 2011) ...............................20

*Pineda v. Bank of Am., N.A.*,
  50 Cal. 4th 1389 (2010) ...........................................................................................23

**California Statutes**

Cal. Bus. & Prof. Code § 17200 *et seq.* .................................................................2, 3, 4

Cal. Labor Code § 203 ...............................................................................................23

Cal. Labor Code § 2698 *et seq.* ...................................................................................6

Cal. Labor Code § 2810.3 ...........................................................................2, 14, 15, 22

**Other Authorities**

Fed. R. Civ. Proc. 12 ................................................................................................12

Fed. R. Evid. 201 ........................................................................................................4

TABLE OF AUTHORITIES
Case No. 4:20-cv-01613-HSG

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The Second Amended Complaint ("SAC") of Plaintiffs Maria de la Luz Perez Bautista, Luz Perez Bautista, and Salvadora Correa ("Plaintiffs") is much longer than its predecessor, but equally devoid of merit as to Defendant Juul Labs, Inc. ("JLI").  Since the SAC fails to allege that JLI is a proper defendant to this case, the SAC should be dismissed as to JLI in its entirety and with prejudice.

Plaintiffs are former campaign workers that political consultant Defendant Long Ying International, Inc. ("Long Ying") hired as independent contractors to provide canvassing, phone banking, and administrative services regarding the Yes on C Campaign.  The Yes on C Campaign sought to garner support for a ballot initiative that would overturn the ban on the sale of electronic cigarettes in San Francisco.  The Coalition for Reasonable Vaping Regulation ("CRVR") contracted with Long Ying and its principal, Defendant David Ho ("Ho"), to field a team of workers to provide canvassing and phone banking services in support of the Yes on C Campaign.  The campaign lasted no more than one and a half months prior to its suspension.  Plaintiffs now sue on behalf of themselves and a putative class of campaign workers (collectively, the "Campaign Workers") for alleged wage and hour violations.

As the Court recognized in granting JLI's previous motion to dismiss, ECF No. 98 ("Order"), the First Amended Complaint ("FAC") failed to allege that JLI was an employer of the Campaign Workers, as JLI had no relationship with, and exercised no control over, the Campaign Workers.  Since each of Plaintiffs' causes of action relied on the mistaken premise that JLI was somehow an employer of Plaintiffs, the Court dismissed the FAC in its entirety.

The SAC fares no better.  The amended allegations focus in large part on the role of various third parties and political consultants not identified in the previous iteration of the complaint, such as Whitehurst Mosher, S2 Partners, and DCI Group AZ.  While Plaintiffs purport that these allegations demonstrate control by JLI over Campaign Workers, the added allegations in fact do just the opposite— they reveal that JLI is a producer of electronic nicotine delivery systems (ENDS) that relied on the expertise of political consultants and firms to actually oversee and manage all aspects of the Yes on C Campaign and the associated work performed by the Campaign Workers.  The SAC admits as much,

repeatedly describing the direct role that such third parties, in conjunction with Ho and Long Ying, had in managing the day-to-day operations of the Campaign.  Meanwhile, the SAC describes JLI's role as providing minimal strategic input from a bird's eye view, completely divorced from the day-to-day work of the Campaign Workers.  The absence of any control by JLI, whether directly or as a supposed alter ego of CRVR, compels another dismissal of the complaint—this time with prejudice.

## II.   STATEMENT OF ISSUES TO BE DECIDED

1.   Whether the SAC adequately alleges a theory of direct employment against JLI such that JLI can be found liable for the harms alleged by Plaintiffs.

2.   Whether the SAC adequately alleges a theory of joint employment against JLI such that JLI can be found liable for the harms alleged by Plaintiffs.

3.   Whether the SAC adequately alleges that JLI is a client employer within the meaning of California Labor Code § 2810.3 such that JLI can be found liable for the harms alleged by Plaintiffs.

4.   Whether the SAC adequately alleges that JLI is an alter ego of CRVR such that JLI can be held liable for any allegations against CRVR.

5.   Whether the SAC adequately alleges that treating JLI and CRVR as separate entities will lead to an inequitable result.

6.   Even assuming that the SAC had adequately alleged that JLI is an alter ego of CRVR, whether the SAC alleges a viable theory of recovery against CRVR.

7.   Whether Plaintiffs' eighth cause of action seeks a remedy available under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL").

8.   Whether Plaintiff Bautista-Perez can maintain a cause of action under the Fair Labor Standards Act ("FLSA").

## III.   FACTUAL BACKGROUND

### A.   Allegations Relating to Pre-Campaign Activity

JLI is an ENDS producer.  In June 2019, San Francisco adopted an ordinance suspending the sale of electronic cigarettes in San Francisco.  [SAC ¶ 24.]  In a series of allegations new to the SAC, Plaintiffs allege that prior to the adoption of the ordinance, JLI allegedly opposed the ordinance by

1   relying on various firms and third parties with expertise in lobbying and public affairs.  For example, the

2   SAC alleges that JLI retained New Deal Advisors; Barnes, Mosher, Whitehurst, Lauter & Partners, Inc.

3   ("Whitehurst Mosher"); and Defendant David Ho to lobby city officials.  [SAC ¶ 25.]  The SAC also

4   alleges that JLI retained Fabrizio Ward, LLC for opinion research and polling, and DCI Group AZ, Inc.

5   to perform public affairs consulting.  [SAC ¶ 26.]

6       Plaintiffs allege that in May 2019, JLI's Vice President of Supply and Demand Planning

7   submitted a proposed petition, later known as "Proposition C" or "Prop C," that would overturn the

8   proposed San Francisco ordinance suspending the sale of electronic cigarettes in the city.  [SAC ¶ 30.]

9   JLI allegedly "hired DCI and Defendant David Ho to develop a grassroots organizing strategy to oppose

10  the passage of the ordinance."  [SAC ¶ 35.]  JLI also allegedly retained Whitehurst Mosher to "manage

11  the [campaign] effort—both direct the campaign and manage the budget."  [SAC ¶ 46.]  On June 11,

12  2019, Ho submitted a detailed budget for phone banking and canvassing operations to Whitehurst

13  Mosher, which Plaintiffs allege on information and belief was also submitted to JLI.  [SAC ¶ 49.]

14  Around July 1, 2019, Long Ying, Ho's company, signed a contract with CRVR to provide campaign

15  services in support of Prop C.  [SAC ¶ 50.]  Plaintiffs allege that CRVR was formally incorporated

16  shortly thereafter on July 3, 2019.  [SAC ¶ 17, 44.]  Other non-JLI entities alleged to have been involved

17  in the Prop C campaign include Trujillo Communications, which engaged in voter identification and

18  outreach, and Ramneek Saini of S2 Partners, Inc., who worked on "Citywide field strategy" and "[d]ay-

19  to-day management of the field operations, including building a functional office from the ground up,

20  recruiting, training and managing staff."  [SAC ¶ 51-52.]  Ms. Saini and Mr. Ho also allegedly sought to

21  hire an "Assistant Lead Organizer" whose "job was to 'manage and oversee all field workers' and to

22  'train canvassers, phonebankers, visibility workers, or GOTV workers."  [SAC ¶ 53.]  The "Assistant

23  Lead Organizer" position is not alleged to been occupied by a JLI employee.  [*Id.*]  "[S]trategy calls

24  regarding the Campaign" were hosted not by JLI, but by Whitehurst Mosher.  [SAC ¶ 54.]

25      During this pre-campaign period, JLI is not alleged to have controlled the work to be performed

26  by Campaign Workers, aside from being the primary funder of the Campaign Committee and being

27  apprised of the Campaign's spending.  [SAC ¶¶ 69-75, 76-81.]  The SAC contradictorily alleges that

28  CRVR "has never been solvent, and . . . never received more than $950 in capital," while at the same

time alleging that CRVR received $1,500,000 from JLI.  [SAC ¶¶ 75, 80.]  The SAC also contains a number of irrelevant allegations regarding CRVR allegedly falsely answering questions on its IRS application [SAC ¶¶ 60-62] and failing to provide necessary information to the California Registry of Charitable Trusts [SAC ¶¶ 63-66].

## B.  Allegations Relating to Campaign Activity

As was stated in the FAC, in July 2019, Long Ying began interviewing potential canvassing and phone banking staff, which was allegedly both "coordinated and conducted by" Long Ying and its administrators.  [SAC ¶ 84.]  Plaintiffs interviewed for jobs as canvassers and phone bankers on the Yes on C Campaign in mid-August 2019.  [SAC ¶¶ 85-87.]  One Plaintiff was allegedly told that "she was being **indirectly** hired by Juul, and that Juul had **contracted with another company** to run the Campaign."  [SAC ¶ 87.]

Plaintiffs admit that, "[a]s part of the hiring process," they each signed and agreed to Independent Contractor Agreements to work as "independent contractor[s]" with Long Ying only. [SAC ¶ 89.]  The agreements were signed by Plaintiffs and "David Ho on behalf of Long Ying" only. [*Id.*]  The Independent Contractor Agreements are not alleged to have been signed by CRVR or JLI, which the agreements themselves confirm.  [ECF No. 35 (Ho Decl.), Exs. A–C.] [1]  In fact, the Independent Contractor Agreements do not even mention JLI.  [*Id.*]  Plaintiffs likewise admit that "other Campaign Workers who were hired by Long Ying were also hired as independent contractors."  [SAC ¶ 88.]

The SAC for the first time alleges that the phone banking and canvassing operations "were run on a day-to-day basis by a group of administrators or leads."  [SAC ¶ 91.]  These "administrators and

---

[1] Federal Rule of Evidence 201 permits the Court to "take judicial notice of 'matters of public record,'" such as the Declaration of David Ho and accompanying exhibits on file with the Court.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  Accordingly, JLI respectfully requests that the Court take judicial notice of ECF No. 35 and its accompanying exhibits.

Further, the "incorporation by reference" doctrine permits a court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration in original).  The contents of the Independent Contractor Agreements are alleged throughout the FAC, and Plaintiffs cannot dispute their authenticity.  Accordingly, the Court may deem the Independent Contractor Agreements incorporated by referenced into the FAC.

leads . . . were hired and primarily paid by Long Ying" [SAC ¶ 92], and allegedly reported to various combinations of Ho, Long Ying, Whitehurst Mosher, Trujillo Communications, and Mr. Tom Hsieh (a non-JLI individual).  [SAC ¶ 93.]  Ho and Whitehurst Mosher, in turn, allegedly reported to Mr. Nat Sillin at JLI.  [*Id.*]

The SAC alleges that the Campaign largely communicated with Campaign Workers through regulatevape@gmail.com, which was owned by Long Ying administrator Mark Yang and was used by Holly Wang (paid by Long Ying) and Brady Penn (paid by CRVR).  [SAC ¶ 94.]  The training manual for Campaign Workers was allegedly prepared by individuals retained by CRVR.  [SAC ¶ 95.]  As with their FAC, Plaintiffs allege that, during phone banking shifts, the Campaign Workers used "telephonic and computer equipment provided by the Campaign" and that CRVR "provided the workers with scripts as to what to say on these calls."  [SAC ¶ 100.]  Plaintiffs further allege that, during canvassing shifts, they performed "door-to-door canvassing or literature distribution within San Francisco" using materials provided by CRVR and following instructions from unspecified "Campaign staff."  [SAC ¶¶ 102-105.]  The Campaign Workers were "hired directly by Long Ying" and were paid an hourly rate of $25 per hour, and later $30 per hour.  [SAC ¶ 106.]  Paychecks were issued directly from Long Ying.  [SAC ¶ 115.]  The SAC also alleges—solely on information and belief—that later in the Campaign, additional staffing agencies, JobShop and AtWork, were used to hire campaign workers as full-time employees.  [SAC ¶¶ 116-123.]

With respect to JLI's alleged "control" of the Campaign Workers, the SAC alleges for the first time that Mr. Sillin of JLI had input regarding scripts, how many Campaign Workers were hired, and a budget for the Campaign.  [SAC ¶¶ 126-130, 133.]  The SAC also alleges that Mr. Sillin had "control over the supervision of Campaign Workers" because he expressed the need for "competent managers given the size of the canvassing team."  [SAC ¶ 130.]  Plaintiffs allege that Mr. Sillin had input on Campaign Workers' hours and the allocation of workers performing canvassing, text banking, and other tasks.  [SAC ¶¶ 131-132.]

On September 30, 2019, JLI announced that it was no longer supporting the Yes on C Campaign.  [SAC ¶ 136.]  The Campaign, as well as all work performed by the Campaign Workers, ended on September 30, 2019.  [SAC ¶ 139.]  Plaintiffs generally allege that Defendants failed to pay the

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

Campaign Workers minimum wages, separation wages, overtime wages, meal periods, and business expenses.  [SAC ¶¶ 142-208.]  From these allegations, Plaintiffs assert individual and class claims against JLI, CRVR, Long Ying, and Ho under the California Labor Code for (1) failure to pay wages owed at separation, (2) failure to furnish accurate wage statements, (3) failure to pay minimum wages, (4) failure to pay San Francisco minimum wage, (5) failure to pay overtime wages, (6) failure to reimburse business expenses, and (7) failure to provide meal periods.  Plaintiffs also assert a claim for (8) violations of California's Unfair Competition Law.  Further, Plaintiffs assert a claim for (9) failure to pay overtime wages under the federal Fair Labor Standards Act.  Finally, Plaintiffs seek (10) civil penalties under the Private Attorneys General Act, Cal. Labor Code § 2698 *et seq*.

## IV.    ARGUMENT

### A.    Legal Standard

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  The Court's inquiry is generally "limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff."  *Id.*  The Court may also "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Under this standard, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  A plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  The Court must disregard allegations that are legal conclusions, even when disguised as facts.  *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of

truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014).

**B.     The SAC Fails to Allege Any Basis for Liability Against JLI.**

The SAC should be dismissed in its entirety with prejudice because it fails to allege any theory under which JLI would be liable to Plaintiffs or the putative class under any one of their ten causes of action.  As the Court recognized in its Order, each of Plaintiffs' causes of action relies on the assumption that JLI was, in some capacity, "an employer" of the Campaign Workers.  [*See* Order (finding that Labor Code claims, PAGA claim, and UCL claim were "based on the same alleged statutory violations as Plaintiffs' other causes of action," and that FLSA claim "mirrors the standard applicable under California law").]  In sum, the SAC fails to allege that JLI would be directly liable to Plaintiffs.

**1.     The SAC Does Not Pursue a Theory of Direct Employment Against JLI.**

As with Plaintiffs' FAC, the SAC does not, and cannot, pursue a theory of direct employment against JLI.  To establish liability as a sole or direct employer, a plaintiff must first establish that the defendant is a "hirer" or "hiring entity" with respect to the plaintiff.  *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 955–56 (2018).  Here, Plaintiffs do not allege that JLI was the "hiring entity" with respect to the Campaign Workers.  The Independent Contractor Agreements at issue in this action were entered into solely between Long Ying and the campaign workers.  [ECF No. 35 (Ho Decl.), Ex. A.]  Further, Long Ying, the actual hiring entity, is not alleged to be an alter ego of JLI (nor could it be).  [*See* SAC.]  Thus, Plaintiffs' theory of liability appears to be that JLI was a "joint employer[]," rather than a direct employer, of Plaintiffs.  [SAC ¶¶ 21-22.]  It is well established that "the *Dynamex* ABC test does not apply in the joint employment context."  *Henderson v. Equilon Enterprises, LLC*, 40 Cal. App. 5th 1111, 1130 (2019) (emphasis added).  Since JLI is not an alleged "hiring entity" for the Campaign Workers, JLI is not liable under a direct employment theory.

**2.     Plaintiffs Cannot Viably Allege That JLI Is a Joint Employer of the Campaign Workers.**

The SAC fails to allege a viable theory of joint employment against JLI.  "[T]he *Dynamex* ABC test does not apply in the joint employment context."  *Henderson v. Equilon Enterprises, LLC*, 40 Cal. App. 5th 1111, 1130 (2019).  Instead, "the governing standard [for joint employment] is found in *Martinez*."  *Id.*  Under the *Martinez* standard, a defendant can be liable under a joint employment theory

only if it "(a) . . . exercise[s] control over the wages, hours, or working conditions . . . , or (b) . . . suffer[s] or permit[s work], or (c) . . . engage[s]" workers to perform labor.  *Henderson v. Equilon Enterprises, LLC*, 40 Cal. App. 5th 1111 (2019) (citing *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010)).  None of these prongs is satisfied here.

**a.      JLI Did Not Control Workers' Wages, Hours, or Working Conditions.**

The SAC fails to allege that JLI controlled the wages, hours, or working conditions of the Campaign Workers within the meaning of *Martinez*.  As noted in the Court's Order, with respect to the previous iteration of the complaint, "Plaintiffs' allegations of control over working conditions primarily concern David Ho, the principal of Long Ying, and unidentified campaign staff."  [*Id.* at 8:2-4.]  Critically, the FAC alleged that "David Ho oversaw the phone banking and canvassing operation at the office."  [FAC ¶ 34.]  The SAC now attempts to walk back those allegations by *deleting* the allegation regarding control by David Ho, and replacing it with allegations that it was actually Mr. Sillin of JLI who "had control over Campaign Workers' working conditions."  [SAC ¶ 126.]

As an initial matter, a court may disregard or discredit allegations that "contradict[] earlier pleadings."  *In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 WL 1561584, at *2 (N.D. Cal. June 3, 2009).  Further, Plaintiffs' self-serving use of the word "control" is not only belied by their prior pleading, but by the new allegations in the SAC, which demonstrate that only entities *other than JLI* exercised the requisite control over the Campaign Workers.  For example, Plaintiffs allege that "DCI and Defendant David Ho" were hired "to develop a grassroots organizing strategy."  [SAC ¶ 35.]  Plaintiffs also concede that Whitehurst Mosher was retained to "manage the [campaign] effort—both **direct the campaign and manage the budget**."  [SAC ¶ 46 (emphasis added).]  The SAC also admits that "Mr. Ho submitted a detailed budget proposal to Whitehurst Mosher for phone banking and canvassing operations," and only alleges as an afterthought, that "[o]n information and belief, this proposal was also submitted to Juul."[2]  [SAC ¶ 49.]  Further contradicting the notion of control by JLI,

---

[2] Allegations pleaded on information and belief, without further factual support, are insufficient.  *See Solis v. City of Fresno*, 2012 WL 868681, at *8 (E.D. Cal. Mar.13, 2012) ("In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."); *Simonyan v. Ally Fin. Inc.,* 2013 WL 45453, at *2 (C.D. Cal. Jan.3, 2013) (noting that "factual allegations . . . based on 'information and belief' and contain[ing] nothing

1  Plaintiffs concede that the phone banking and canvassing operations "were run on a day-to-day basis by

2  a group of administrators or leads."  [SAC ¶ 91.]  These "administrators and leads . . . were hired and

3  primarily paid by Long Ying" [SAC ¶ 92], and none of the administrators or leads are alleged to include

4  JLI employees.  To the contrary, it was Ramneek Saini of S2 Partners (*i.e.*, a non-JLI individual), who

5  worked on "Citywide field strategy" and "**[d]ay-to-day management of the field operations**, including

6  building a functional office from the ground up, recruiting, training and managing staff."  [SAC ¶¶ 51-

7  52 (emphasis added).]  Additionally, the Campaign included a non-JLI "Assistant Lead Organizer"

8  whose "job was to '**manage and oversee all field workers**' and to '**train canvassers, phonebankers**,

9  visibility workers, or GOTV workers.'"  [SAC ¶ 53 (emphasis added).]  In short, the SAC alleges that

10 the Campaign Workers were controlled by Mr. Ho, Long Ying, and numerous other entities completely

11 separate from JLI.  The new allegations in the SAC not only fail to support the existence of control by

12 JLI, but actively controvert such a notion.

13         Despite the foregoing admissions, Plaintiffs attempt to shoehorn JLI into the case with a series of

14 allegations that they label as "control."  Notwithstanding Plaintiffs' labels, the substance of the

15 allegations fails to demonstrate that JLI is a joint employer.  For example, Plaintiffs contend that JLI, in

16 conjunction with "Whitehurst Mosher, Long Ying, and Ms. Saini," had input regarding scripts used by

17 the Campaign Workers.  [SAC ¶ 126.]  However, by the SAC's own allegations, JLI's input was

18 "certainly open to suggestions" from the numerous individuals and entities involved in the process.

19 [SAC ¶ 127.]  All this allegation shows is that JLI was *one of many parties* giving input on high-level

20 messaging for the Campaign.  However, as Plaintiffs have already conceded, the day-to-day operations,

21 management, and oversight of the Campaign Workers was controlled by non-JLI entities.  [SAC ¶¶ 35,

22 46, 49, 51-53, 91-92.]  The SAC also alleges that Mr. Sillin had "control over how many Campaign

23 Workers were hired."  [SAC ¶ 128.]  However, this allegation again only relates to high-level input on

24 the scope of the Campaign, not day-to-day control of the Campaign Workers.

25         The SAC goes on to allege that JLI and Whitehurst Mosher both "had control over Campaign

26 Workers' compensation" based on the allegation that they received an email from Tom Hsieh outlining

27

28
         more than a rote recitation of the required elements of each respective claim . . . fall well short of the
         requirements set forth in *Iqbal*.").

hourly rates and incentive compensation for Campaign.  [SAC ¶ 129.]  This fails to demonstrate control over wages.  Under the *Martinez* test, "'control over wages' means that a person or entity has the power or authority to **negotiate <u>and</u> set** an employee's rate of pay."  *Futrell v. Payday California, Inc.*, 190 Cal. App. 4th 1419, 1432 (2010) (emphasis added).  Plaintiffs' allegations fail on both counts.  First, Plaintiffs' allegations reveal that the Campaign Workers' pay was set not by JLI, but by a non-JLI individual who merely sent rates of pay to Mr. Sillin and others for review.  [SAC ¶ 129.]  Second, the allegations do not demonstrate that JLI was directly negotiating with Campaign Workers regarding their pay.  The SAC alleges only that JLI was kept apprised of proposed salaries for the Campaign Workers, but that it was left to Long Ying and others to handle the actual negotiation of salaries.  [ECF No. 35 (Ho Decl.), Exs. A–C.]  Courts have dismissed joint employer complaints where, as here, the allegations fail to allege that the supposed joint employer "conducted actual salary negotiations" with plaintiffs.  *Valencia v. N. Star Gas Co.*, 291 F. Supp. 3d 1155, 1160–61 (S.D. Cal. 2018) (granting motion to dismiss where "[t]he FAC is lacking, for example, allegations that [the alleged joint employer] conducted **actual salary negotiations** . . . , actually set . . . wage rates at a certain number, or other facts indicating that [the alleged direct employer] delegated the power or authority to set the wages of its employees to [the alleged joint employer]").

Plaintiffs also allege that Mr. Sillin had "control over the supervision of Campaign Workers" based on the allegation that Mr. Sillin sent an email stating that the Campaign "need[ed] competent managers given the size of the canvassing team."  [SAC ¶ 130.]  Mr. Sillin is further alleged to have stated that Georgine Trujillo (of Trujillo Communications) and her "team's expertise on canvassing" would be needed to manage and supervise the Campaign Workers.  [*Id.*]  The SAC twists itself into knots by trying to characterize this as "control over the supervision of the Campaign Workers."  This allegation does not demonstrate control by JLI, but the exact opposite.  JLI expressly *avoided* supervision of the Campaign Workers, a role that was instead assumed by non-JLI "competent managers" with the requisite expertise in this field, such as Trujillo Communications.  The fact that JLI wanted its vendors to engage competent workers is hardly a harbinger of "control" of those workers.

The SAC next contends that JLI had supposed "control" over Campaign Workers' hours based on an email in which Mr. Sillin stated, "Dave , / <u>Here's what we're implementing:</u> / . . . Field shifts

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

should be 4 to 8 pm on weekdays, 10 a.m. to 8 p.m. on Sat, noon to 8 pm. on Sunday – each canvasser should be getting 4.5 FAVORABLES an hour. . . ."  [SAC ¶ 131.]  This allegation merely demonstrates that JLI had input regarding when shifts would generally occur (*i.e.*, in the evening on weekdays, and all day on weekends).  However, it does not demonstrate that JLI had the power to control or compel any specific Campaign Worker to work any specific hours or at any specific time.

On this point, *Curry v. Equilon Enterprises* is instructive. 23 Cal. App. 5th 289 (2018), *as modified on denial of reh'g* (May 18, 2018).  In *Curry*, Shell Oil Products US, instead of operating its own service station, leased its service station to an operator/lessee named ARS.  *Id.*  The plaintiff sued ARS for various wage and hour violations, and further sued Shell as an alleged joint employer of the plaintiff.  *Id.*  In support of her joint employment theory, the plaintiff alleged that Shell "indirectly controlled working conditions at the stations through its common contracts and in mandating that the operators keep their stations open and staffed 24 hours a day, every day of the year," thereby controlling her hours as an employee at the station.  *Id.* at 297.  The plaintiff also argued that Shell required ARS, and by extension ARS' employees, to perform specific "duties and tasks" at the station.  *Id.*  On these facts, the Court of Appeal rejected the plaintiff's joint employment theory, noting that "Shell required particular tasks be performed by ARS, but did not mandate who or how many employees execute the tasks."  *Id.* at 303.  Further, the Court of Appeal rejected the notion that Shell controlled the plaintiff's hours.  While the plaintiff "contend[ed] Shell controlled her hours because Shell required the gas station to be open 24 hours a day, seven days a week, and required various tasks be performed on a daily basis," Shell had no input on *which* employees performed those duties, and thus had no power to compel any particular employee to work at a particular time or for any duration of time.  *Id.* at 303.  In short, "Shell did not mandate that [the plaintiff] perform the tasks; rather, Shell required that ARS complete the tasks, and ARS placed the burden on Curry."  *Id.* at 304.

The same holds true here.  While Long Ying sought JLI's input on worker shifts, Plaintiffs fail to allege any facts demonstrating that JLI had any control over *specific workers* or the number of workers that had to fill each shift.  JLI could not control whether a noon to 8 pm shift would be covered by one Campaign Worker working eight hours, or by two Campaign Workers working four hours each, or by four Campaign Workers working 2 hours each.  As demonstrated by *Curry*, general high-level input

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

1   regarding hours requirements, without control as to specific workers, does not amount to control over

2   hours within the meaning of *Martinez*.  *Id.*

3          At best, Plaintiff's allegations of control amount to nothing more than **involvement** on the part

4   of JLI.  Indeed, mere involvement in the high-level administration of a political campaign "does not

5   constitute actual authority" over its workers.  *Katz v. DNC Servs. Corp.*, No. CV 16-5800, 2019 WL

6   4752056, at *5 (E.D. Pa. Sept. 27, 2019).  In *Katz*, a group of campaign workers brought a lawsuit

7   against the Democratic National Committee ("DNC") and the Pennsylvania Democratic Party ("PDP")

8   claiming unpaid overtime in violation of the FLSA and Pennsylvania's minimum wage statute.  *Id.* at

9   *1.  After voluntarily obtaining leave to amend their complaint twice, the campaign workers filed a

10  second amended complaint wherein they alleged the DNC and PDP were their joint employers or

11  alternatively consisted of a vertically integrated, alter-ego single employer.  *Id.* at *1.  The court found

12  plaintiffs only alleged direct employment by the PDP and dismissed the DNC under Rule 12(b)(6).  *Id.*

13  at *1.  The plaintiffs filed a third amended complaint alleging the same theories of liability.  *Id.*  Using a

14  joint employer analysis substantially similar to the test used in this Circuit, the court in *Katz* found the

15  campaign workers' allegations represented the DNC's mere involvement, not control over their

16  employment.  *Id.* at *6.  For example, the court found allegations that the DNC instructed the PDP

17  regarding improvements to the voter database, suggested target demographics for voter calls, and

18  determined options for monthly payments to campaign workers, were ultimately insufficient to allege an

19  "authority to promulgate work rules, assignments, and set conditions of employment."  *Id.* at *5.

20  Similarly, the court was unpersuaded by allegations that the DNC provided "guidance and training" to

21  the PDP on weekly conference calls, finding the campaign workers "at best pled Defendant DNC's

22  involvement; not its actual authority."  *Id.* at *5.

23         Here, Mr. Sillin is alleged to have engaged in activities on behalf of JLI such as providing input

24  regarding the scripts used by phone bankers, suggesting metrics for meeting overall goals of the

25  campaign, and being present on weekly phone calls with various other individuals and entities involved

26  with the campaign.  [SAC ¶¶ 126, 130, 131.]  These allegations bear a striking resemblance to the

27  allegations advanced by the campaign workers in *Katz*.  In *Katz*, these allegations were deemed to

28  constitute involvement rather than control and should be afforded the same treatment here.

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

In summary, the same issue permeates all of Plaintiffs' allegations of control by JLI.[3]  The SAC alleges merely that JLI, among numerous other third parties, provided input on high-level strategic decisions, while the actual oversight, management, and control of the Campaign Workers was handled by non-JLI entities.  [SAC ¶¶ 35, 46, 49, 51-53, 91-92.]  The SAC fails to allege that JLI exercised control over the wages, hours, or working conditions of the Campaign Workers.

### b. JLI Did Not Suffer or Permit the Campaign Workers to Perform Labor.

The SAC also fails to allege that JLI "suffered or permitted" the Campaign Workers to perform labor under the second *Martinez* prong.  Under California law, "suffered or permitted" means that an entity may be liable as a joint employer where it "permit[s] by acquiescence" or "suffer[s] by a failure to hinder" the work of the plaintiff.  *Curry v. Equilon Enterprises, LLC*, 23 Cal. App. 5th 289, 311 (2018).  However, under this standard, merely being aware of work is insufficient to give rise to a joint employment relationship.  Under California law, even where an entity is "undoubtedly aware" of work being performed, no employment relationship can be found absent some "power" over the workers:

> No employment relationship was found under this test because while the produce merchants were **undoubtedly aware** that the farmer used laborers to satisfy his contracts, the produce merchants had no authority to prevent such work from occurring.  "Neither [produce merchant] suffered or permitted plaintiffs to work because neither had the **power to prevent plaintiffs from working**.  [The farmer] and his foremen had the **exclusive power to hire and fire his workers**, to set their wages and hours, and to tell them when and where to report to work."

---

[3] Allegations relating to JLI's alleged termination of all Campaign Workers via termination of the Campaign was already deemed insufficient in Plaintiffs' FAC.  [*See* Order.]  Moreover, the allegation that JLI had "control over whether to discharge Campaign Workers" [SAC ¶ 132] is insufficient for the same reasons.  The SAC only alleges a general strategy regarding "let[ting] go" Campaign Workers who could not canvass or text bank.  However, the decision regarding whether to terminate a specific Campaign Worker was ultimately to be "assess[ed]" and decided by Long Ying.  *Id.*

Further, the SAC alleges—solely on information and belief—that later in the Campaign, additional staffing agencies, JobShop and AtWork, were used to hire campaign workers as full-time employees.  [SAC ¶¶ 116-123.]  The relationships between JobShop and AtWork and the workers they employed is not the subject of this lawsuit.  Even if JobShop and AtWork voluntarily chose to provide employee benefits to their workers, that does not alter the analysis vis-à-vis JLI.  Nor is JobShop's decision to use an employee model surprising, given that JobShop is alleged to have offered "longer-term job security" in contrast to the transitory and temporary nature of a single political campaign.  [SAC ¶ 123.]

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

1    *Henderson*, 40 Cal. App. 5th at 1118; *cf. Katz*, 2019 WL 4752056, at *5 (allegations that defendant

2    posted job applications for campaign workers and participated in the training of those hired "does not

3    plausibly allege that Defendant [] could have hired those individuals or that it had the authority to fire

4    them if they failed to fulfill their job duties.").

5           This analysis leads to an identical conclusion as the prior prong.  Here, JLI is not alleged to have

6    had any power over the campaign workers (nor could any such allegations be truthfully alleged).

7    Rather, Long Ying, David Ho, Whitehurst Mosher, DCI, Ramneek Saini, the Assistant Lead Organizer

8    position, and various other third parties allegedly managed all day-to-day operations of the Campaign.

9    [SAC ¶¶ 35, 46, 49, 51-53, 91-92; *see supra* Part IV.B.2.a.]  Thus, JLI did not "permit" or "suffer" the

10   campaign workers to work under California law.  *Henderson*, 40 Cal. App. 5th at 1118.

### c.      JLI Did Not Engage the Campaign Workers.

12          The last prong of joint employment—"engag[ing]" a worker to perform labor—is disposed of by

13   reference to Part IV.B.1., *supra*.  "Engage," in this context, is "construed as the common law definition

14   of an employment relationship." *Henderson*, 40 Cal. App. 5th at 1117.  As explained above, Plaintiffs

15   fail to allege a direct common law employment relationship between JLI and the Campaign Workers.

16   *See supra* Part IV.B.1.  As a result, JLI did not "engage" the Campaign Workers to perform labor on its

17   behalf.

18          For the foregoing reasons, the SAC fails to allege that JLI is a joint employer of the Campaign

19   Workers under any prong of *Martinez*.  *Martinez*, 49 Cal. 4th at 59.

### 3.      The SAC Fails to Allege that JLI Is Liable as a "Client Employer" Under

### Cal. Labor Code § 2810.3.

22          The SAC departs from the FAC in that it completely omits any reference to JLI being an alleged

23   "client employer" under Cal. Labor Code § 2810.3.  Whereas the FAC contained multiple references to

24   JLI and CRVR being alleged "client employers" with respect to the Campaign Workers [FAC ¶¶ 15-16,

25   20, 77-82, 93, 100, 107, 116], the SAC excises all references to "client employers" or Cal. Labor Code §

26   2810.3 entirely.  Thus, the SAC fails to state any theory of liability against JLI based on JLI being a

27   supposed "client employer" of the Campaign Workers.

28          To the extent Plaintiffs continue to pursue a client employer theory, such theory is devoid of

merit.  Section 2810.3 imposes liability only in the limited situation where a defendant (the "client employer") receives labor from another contractor (the "labor employer") that is "within [the client employer's] usual course of business."  Cal. Labor Code § 2810.3(a)(1)(A) ("'Client employer' means a business entity, regardless of its form, that obtains or is provided workers to perform labor **within its usual course of business** from a labor contractor." (emphasis added)).

The SAC does not allege that the work for which Long Ying retained the Campaign Workers constitutes work within JLI's "usual course of business."  It is undisputed that JLI is in the business of being "an electronic cigarette producer."  [SAC ¶ 16.]  Conversely, Long Ying is engaged in the completely distinct business of providing "a full complement of public affairs and advocacy services." [SAC ¶ 19.]  Plaintiffs do not, and cannot, allege that public affairs and advocacy services fall within the "usual course of business" of producing electronic cigarettes.  This notion is further undermined by the fact that the Yes on C Campaign lasted no more than one and a half months.  [SAC ¶ 59.]  A transitory political campaign does not constitute a "usual" part of JLI's business.  Since JLI and Long Ying engage in completely unrelated lines of business, the allegations cannot support a finding that JLI is jointly liable as a "client employer."  As a result, the SAC fails to allege a theory of recovery against JLI under Cal. Labor Code § 2810.3.

In summary, JLI did not employ, or even contract with, the Campaign Workers, nor are they alleged to have done so.  Further, the SAC fails to allege that JLI controlled the Campaign Workers' wages, hours, or work conditions within the meaning of *Martinez*.  While Plaintiffs liberally use the "control" label in connection with JLI, the underlying allegations reveal that the Campaign Workers' day-to-day operations were actually controlled by individuals and entities completely separate from JLI. [SAC ¶¶ 35, 46, 49, 51-53, 91-92.]  JLI has no discernable relationship with the Campaign Workers that could give rise to employment-based liability.  Plaintiffs' SAC should therefore be dismissed with prejudice as to JLI.

### C.     The SAC Fails to Allege That JLI Is Liable as an Alter Ego of CRVR.

Plaintiffs' allegation that JLI and CRVR "are each other's alter egos and form a single enterprise" does not salvage the SAC.  [SAC ¶ 18.]  At the outset, "alter ego liability is considered a **drastic remedy** that should be invoked only in extreme cases."  *Channell Commercial Corp. v.*

*Wilmington Mach., Inc.*, No. EDCV142240DMGDTBX, 2016 WL 7638179, at *1 (C.D. Cal. July 5, 2016) (emphasis added).  To plead an alter ego theory, a plaintiff must allege **both** of two elements: "First, there must be such a **unity of interest and ownership** between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an **inequitable result** if the acts in question are treated as those of the corporation alone." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1042 (C.D. Cal. 2015) (emphasis added).  Corporations are entitled to a "presumption of corporate separateness" even at the pleading stage.  *Id.* at 1043 (C.D. Cal. 2015) (citing *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946(AGS), 2002 WL 432390, *12 (S.D.N.Y. Mar. 20, 2002)).  "Conclusory allegations of 'alter ego' status are insufficient to state a claim.  **Rather, a plaintiff must allege specific facts supporting both of the elements of alter ego liability**."  *Id.* (emphasis added).

### 1.    Alter Ego Liability Has No Applicability to the Allegations of this Case.

Plaintiffs' alter ego theory fails for the fundamental reason that the theory has no applicability to the facts alleged in the SAC.  Critically, the overwhelming weight of authority discussing alter ego liability discusses it in the context of a parent-subsidiary or shareholder-corporation relationship.  *See, e.g.*, *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980) (analyzing whether parent and subsidiary were alter egos); *Gerritsen*, 112 F. Supp. 3d at 1042 (parent-subsidiary relationship); *United States v. Pangang Grp. Co.*, 879 F. Supp. 2d 1052, 1067 (N.D. Cal. 2012) (parent-subsidiary relationship); *Doney v. TRW, Inc.*, 33 Cal. App. 4th 245, 249 (1995) ("Alter ego is essentially a theory of vicarious liability under which the **owners of a corporation** may be held liable for harm for which the corporation is responsible where, because of the corporation's utilization of the corporate form, the party harmed will not be adequately compensated for its damages." (emphasis added)).  Indeed, as the Court recognized in its prior dismissal order, a plaintiff may advance a "single enterprise theory" of alter ego liability where "there is really only one **corporation**."  [Order at 5:17-27 (citing *Mossimo Holdings LLC v. Haralambus*, No. CV 14-05912 DDP JEMX, 2015 WL 476298, at *3 (C.D. Cal. Feb. 3, 2015) (quoting *Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 301 (1985)) (emphasis added).]  The theory is "an equitable doctrine applied to reflect partnership-type liability principles when **corporations** integrate their resources and operations to achieve a common business purpose."  [*Id.*

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

1   (citing *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1108 (2013)).]

2       Thus, alter ego liability is completely inapplicable as between JLI and CRVR, as they have no

3   corporate connection, let alone a parent-subsidiary relationship.  Further, courts have specifically held

4   that campaigns are not alter egos of the entities that sponsor them.  *See, e.g.*, *Vitale & Assocs., LLC v.*

5   *Lowden*, No. 2:12-CV-1400-JAD-VCF, 2015 WL 4603471, at *5 (D. Nev. July 30, 2015), *aff'd*, 690 F.

6   App'x 555 (9th Cir. 2017) (holding that candidate was not alter ego of political campaign where all

7   work was "authorized, directed and requested by . . . the campaign manager" rather than the candidate");

8   *Webber v. Deck*, 433 F. Supp. 3d 237, 253 (D.N.H. 2020) (holding that presidential candidate Trump

9   was not an alter ego of the Trump Campaign); *Katz*, 2019 WL 4752056, at *4 (rejecting alter ego

10  relationship between two political organizations forming relationship for year-long campaign, reasoning

11  there is "no legal precedent providing for an intermittent and periodic vertically integrated, single

12  employer, alter ego relationship that comes into existence every four years.").[4]

13      To put it simply, there is no corporate veil to pierce.  Therefore, the alter ego doctrine is wholly

14  inapplicable to the allegations of the SAC, and Plaintiffs' attempt to plead alter ego liability against JLI

15  should be rejected on this basis alone.

16              **2.      Even if the Alter Ego Doctrine Applied, the SAC Fails to Plead its Elements.**

17      However, even if the alter ego doctrine were applicable here, the SAC fails to plead its requisite

18  elements:  a unity of interest and ownership, and an inequitable result.  *Gerritsen*, 112 F. Supp. 3d at

19  1042.

20              **a.      Plaintiffs Fail to Plead a Unity of Interest and Ownership Between**

21                       **CRVR and JLI.**

22      The SAC fails to plead the requisite facts demonstrating a "unity of interest and ownership"

23  between CRVR and JLI.  *Gerritsen*, 112 F. Supp. 3d at 1042.  The SAC's alter ego theory is based on

24  the following allegations:

25

26  [4] The dearth of case law supporting Plaintiffs' liability arguments in the political campaign context is not
    without good reason. If political campaigns were routinely held to be alter egos of entities which
27  financially sponsor them, there could be a resulting chill on First Amendment activity as companies
    would hesitate to engage in financial sponsorship activity out of fear their involvement would be used as
28  a basis to hold them liable for the actions of the campaigns they seek to support. Such a result could
    potentially implicate free speech rights recognized by the Supreme Court.  *See Citizens United v.*
    *Federal Election Commission*, 558 U.S. 310 (2010).

a.    The Coalition used the same core personnel already hired by Juul, see, e.g., infra at § V.D;

b.    Juul operated in the name of the Coalition prior to the Coalition's incorporation, see, e.g., infra at §§ V.B, V.C, V.D;

c.    The Coalition disregarded corporate formalities, see, e.g., infra at § V.F.;

d.    The Coalition was inadequately capitalized since its conception, and relied solely on no-interest loans from Juul for financial support, see, e.g., infra at § V.G.;

e.    The Coalition was used as a mere shell to conduct Juul's affairs, see, e.g., infra at §§ V.H., V.L;

[SAC ¶ 18.]  These conclusions, as well as the factual allegations that Plaintiffs contend support them, are insufficient to invoke the drastic remedy of alter ego liability.  A "unity of interest and ownership" must be shown through factors such as "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other."  *Gerritsen*, 112 F. Supp. 3d at 1043.

Plaintiffs' allegations not only fail to support an alter ego theory, but directly undermine an alter ego theory.  For example, the SAC leans heavily on the allegation that "[CRVR] used the same core personnel already hired by Juul."  [SAC ¶ 18.a.]  However, as the SAC admits, only a single one of those personnel—Jon Berrier—was even a JLI employee.  [SAC ¶ 67.]  The remainder of the individuals and entities alleged to constitute or have been hired by CRVR are completely separate and apart from JLI.  For example, the SAC alleges that the "General Consultant[]" for the campaign was Whitehurst Mosher, a consulting firm with a completely separate identity from JLI.  [SAC ¶ 46.]  In fact, Whitehurst Mosher—not JLI—allegedly "host[ed] twice weekly strategy calls regarding Campaign."  [SAC ¶ 53.]  CRVR also allegedly signed contracts with Long Ying, Mr. Allbee, and six staff members of DCI Group AZ, Inc.  [SAC ¶ 47.]  CRVR allegedly entered into an agreement with Trujillo Communications, yet another non-JLI third-party firm.  [SAC ¶ 51.]  Ramneek Saini of S2 Partners was also appointed as the Grassroots / Field Manager" for CRVR.  [SAC ¶ 52.]  The picture that emerges from Plaintiffs' allegations is not that JLI was identical to CRVR, but that CRVR received input from a wide range of

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

diverse and disparate entities.[5]  As the Court noted in its Order, "Plaintiffs' allegations about funding and a single shared employee are insufficient to overcome the presumption of respect for the corporate form."  [Order at 6:13-15.]  The SAC has failed to identify overlap between CRVR and JLI, and has in fact demonstrated on all the ways in which they are distinct.

Plaintiffs' allegations regarding supposed disregard of corporate formalities are also ineffective. The corporate formalities that CRVR allegedly failed to adhere to all relate to whether CRVR accurately responded to questions and provided appropriate paperwork to the IRS and Registry of Charitable Trusts.  [SAC ¶¶ 58-68.]  However, whether CRVR accurately completed paperwork for government agencies has no bearing on whether CRVR's dealings with JLI—the relevant inquiry for a corporate formalities analysis.  *See, e.g.*, *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980) (analyzing whether "[t]he parent and subsidiary **have dealt with each other** as distinct corporate entities"); *United States v. Pangang Grp. Co.*, 879 F. Supp. 2d 1052, 1067 (N.D. Cal. 2012) (discussing whether parent and subsidiary disregarded corporate formalities with respect to each other).

Plaintiffs' allegation that JLI provided funding and made no-interest loans to CRVR is also insufficient.  [SAC ¶¶ 69-75.]  This Court has already rejected "Plaintiffs' allegations about funding" as insufficient.  [Order at 6:13-15.]  Further, Courts have rejected far more robust alter ego allegations as insufficient.  *See, e.g., Gerritsen*, 112 F. Supp. 3d 1011 (rejecting alter ego allegations even where subsidiary "became shell corporation[] wholly owned by [parent], and mere conduit[] through which [parent] conducts business," and was "wholly-owned subsidiary of, and was completely dominated, directed, and controlled by [parent]").

Finally, Plaintiffs' allegation that CRVR was merely a "shell to conduct Juul's affairs" [SAC ¶ 18.e.] is inaccurate and contradicted by the SAC's allegations.  As discussed above, CRVR's alleged activities not only supposedly implicated JLI, but various third parties and consultants such as Whitehurst Mosher, DCI Group, and S2 Partners, each of which whom, unlike JLI, are alleged to have had a direct role in running the Campaign and supervising the Campaign Workers.  [SAC ¶¶ 35, 46, 49,

---

[5] Nor does Plaintiffs' allegation that JLI engaged in activities on behalf of CRVR prior to CRVR's incorporation salvage their alter ego theory.  As the allegations reveal, even in its pre-incorporation stage, CRVR was alleged to have made payments to Long Ying, Whitehurst Mosher, DCI Group AZ, and Nate Allbee.  [SAC ¶ 33.]

1  51-53, 91-92; *see supra* Part IV.B.2.a.]  For the foregoing reasons, the SAC fails to allege a unity of

2  interest between JLI and CRVR.

        **b.**    **Plaintiffs Fail to Allege that Treating CRVR and JLI as Separate**

               **Would Lead to an Inequitable Result.**

5         The SAC similarly fails to allege that treating CRVR and JLI would lead to an inequitable result.

6  Under this requirement, the plaintiff must plead facts demonstrating "that adherence to the fiction of the

7  separate existence of the corporation would sanction a fraud or promote injustice."  *Misik v. D'Arco*, 197

8  Cal. App. 4th 1065, 1073 (2011), *as modified* (Aug. 9, 2011).  "The test for this requirement is that if the

9  acts are treated as those of the corporation alone, it will produce an unjust or inequitable result."  *Id.*

10  Further, "[b]ad faith is a critical factor in the analysis" of whether an inequitable result would arise, even

11  at the pleading stage.  *Gerritsen*, 116 F. Supp. 3d at 1143; *see also Neilson v. Union Bank of California,*

12  *N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) (rejecting alter ego where "the complaint fails to

13  allege that Comerica engaged in any bad faith conduct in its acquisition and/or management of

14  Imperial").  Similarly, the Court's Order recognized that an inequitable result must be alleged at the

15  pleading stage, and that Plaintiffs failed to do so.  [Order at 6:23-7:17.]

16         Despite this express instruction from the Court, the SAC does little to plead this requirement

17  except for the conclusory statement that "it would be inequitable to allow Juul to maintain the fiction

18  that it is separate from the Coalition."  [SAC ¶ 18.]  Such conclusory allegations are afforded no weight.

19  *Iqbal*, 556 U.S. at 678 (2009).  The only other allegation that might be read as relating to an inequitable

20  result is the allegation that CRVR was "inadequately undercapitalized."  [SAC ¶ 18.d.]  However, even

21  the SAC contradicts itself in this regard.  The SAC alleges that CRVR "has never been solvent, and . . .

22  never received more than $950 in capital," while at the same time receiving $1,500,000 from JLI.  [SAC

23  ¶¶ 75, 80.]  Thus, Plaintiffs' allegations of undercapitalization are contradicted and without merit.

24  Additionally, Plaintiffs have named David Ho and Long Ying as defendants, the entities that actually

25  signed the Campaign Workers' independent contractor agreements.  Thus, this is not a case where

26  Plaintiffs will be left without recourse if they prevail on their wage and hour claims as to the remaining

27  defendants.  *See Everflow Tech. Corp. v. Millennium Elecs., Inc.*, No. C07-05795 HRL, 2013 WL

28  5132751, at *7 (N.D. Cal. Sept. 13, 2013) (finding alter ego liability where treating entities as separate

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

would "leav[e] [the defendant's] creditors without recourse").

Additionally, the SAC fails to allege any "bad faith" on the part of JLI in connection with its relationship to CRVR (nor could they truthfully make such assertions). Absent from the SAC are any allegations that JLI was deliberately using a shell to evade its debts, or that it knowingly used CRVR as a shield from creditors. Where a pleading fails to allege bad faith on the part of the corporation, the bad faith prong is not met, and the alter ego allegations can be dismissed **at the pleading stage**. *Gerritsen*, 116 F. Supp. 3d at 1143 ("[b]ad faith is a critical factor in the analysis" of whether an inequitable result would arise); *Neilson*, 290 F. Supp. 2d at 1117 (C.D. Cal. 2003) (finding that "plaintiffs have failed adequately to allege that Comerica is liable as the alter ego of Imperial Management" where "the complaint **fails to allege that Comerica engaged in any bad faith conduct in its acquisition and/or management of Imperial**") (emphasis added).

Accordingly, Plaintiffs' alter ego allegations are entirely deficient and fail on this independent basis.

### 3.   Even if CRVR Were an Alter Ego of JLI, the SAC Still Fails as to JLI.

While Plaintiffs' alter ego allegations fall woefully short, the SAC would fail as to JLI even if Plaintiffs could plead viable alter ego allegations, as the SAC similarly fails to plead any basis for liability as to CRVR. The SAC's deficiencies with respect to JLI are equally present in the case of CRVR. First, there can be no direct employment liability against CRVR, as the campaign workers contracted solely with Long Ying, and CRVR is not alleged to be a hiring entity with respect to Plaintiffs or the campaign workers. *See supra* Part IV.B.1.

Nor does the SAC adequately allege that CRVR is a joint employer of Plaintiffs, as Plaintiffs fail to allege that CRVR exercised control over the wages, hours, or working conditions of the Campaign Workers. To the contrary, the SAC admits that the Campaign was run entirely by Long Ying and various parties and consultants not named in this action, such as Whitehurst Mosher, DCI Group, S2 Partners, and Ramneek Saini. [SAC ¶¶ 35, 46, 49, 51-53, 91-92; *see supra* Part IV.B.2.a.] While some of these consultants are alleged to have been *retained* by CRVR, none are alleged to *constitute* CRVR such that CRVR itself can be deemed to have exercised control over the Campaign Workers. Further, even with respect to individuals identified in Exhibit A of the SAC as being affiliated with CRVR, the

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

SAC fails to explain how any of these individuals actually exercised control over the Campaign Workers aside from the generic allegations that they "signed contacts [*sic*] with [CRVR]" and that "their duties would include '[s]upport[ing] the field program with voter identification and outreach'"—duties that do not demonstrate control over the work performed by the Campaign Workers.  [SAC ¶ 48.]  Further, while the SAC briefly alleges that there was a "training manual" prepared by unidentified CRVR staff [SAC ¶ 95], the SAC is silent as to what was even contained in the manual, such that it is impossible to determine whether the manual contained any material or information evincing control on the part of CRVR.

Finally, the SAC fails to allege how the specific tasks performed by the campaign workers— phone banking and canvassing—fall within the "usual course of business" of CRVR such that CRVR would be liable under Labor Code § 2810.3.  *See supra* Part IV.B.3.  For these reasons, Plaintiffs fail to state a claim against CRVR, such that the alter ego allegations, even if accepted as true, cannot form the basis for liability on the part of JLI.

Since the SAC fails to allege any basis for liability against CRVR, there can be no alter ego liability as to JLI even if such a theory had been adequately pleaded.

## D.    Plaintiffs' UCL Claim Seeks Remedies Unavailable As A Matter Of Law.

"A UCL action is equitable in nature; damages cannot be recovered."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  As a result, the California Supreme Court has repeatedly held that "the remedies provided [by the UCL] are limited" and that private UCL plaintiffs "may not recover damages."  *Id.*; *see also Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) ("damages are not available" to private plaintiffs under the UCL); *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999) (UCL "[p]laintiffs may not receive damages, much less treble damages, or attorney fees.").  Further, a plaintiff cannot maintain a UCL claim by disguising a claim for monetary relief as an equitable one.  *See Korea Supply Co.*, 29 Cal.4th at 1151 ("The nonrestitutionary disgorgement remedy sought by plaintiff closely resembles a claim for damages, something that is not permitted under the UCL.").

While Plaintiffs' UCL claim does not clearly identify what money it seeks to recover via restitution, the damages allegedly include reimbursement of "expenses for the Defendants' benefit,

1    unpaid compensation or missed meal periods, and unpaid overtime and regular wages." [SAC ¶ 193.]

2    However, Plaintiffs seek "restitutionary" relief in a manner forbidden under the UCL. *See Korea Supply*

3    *Co.*, 29 Cal. 4th at 1151. "The object of restitution is to restore the status quo by returning to the

4    plaintiff funds in which he or she has an ownership interest." *Korea Supply Co.*, 29 Cal. 4th at 1149.

5    Alternatively, if a plaintiff does not have an ownership interest in the funds, the plaintiff may obtain

6    restitution if he or she has a "vested interest in the money it seeks to recover." *Id.* (emphasis added). In

7    either case, Plaintiffs "must demonstrate that the defendant is in possession of money or property taken

8    from her." *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013)

9    (emphasis added). Put differently, the restitution sought must involve money that can "clearly be traced

10   to particular funds or property in the defendant's possession." *Colgan v. Leatherman Tool Grp., Inc.*,

11   135 Cal. App. 4th 663, 699 (2006) (holding that restitution under the UCL is only available where funds

12   can "clearly be traced to particular funds or property in the defendant's possession"); *EchoStar Satellite*

13   *Corp. v. NDS Grp. PLC*, No. SACV-03-0950DOCJTLX, 2008 WL 4596644, at *9 (C.D. Cal. Oct. 15,

14   2008) (affirming order striking request for restitution of funds that could not "clearly be traced" to

15   defendant).

16          Applying this standard here, Plaintiffs cannot obtain restitution against JLI. Critically, Plaintiffs

17   allege that "Defendant Long Ying International issued bi-weekly paychecks to Plaintiffs and other

18   Campaign Workers," not JLI or CRVR. [SAC ¶ 115.] Since Plaintiffs admit that their payment came

19   from Long Ying, Plaintiffs do not and cannot allege that the money they seek to recover "is in

20   possession of," or "trac[eable]" to, JLI. *See Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d at

21   1324; *Colgan*, 135 Cal. App. 4th at 699. In essence, the remedy that Plaintiffs label as "restitution" is

22   not restitution at all with respect to JLI. Due to the limited universe of remedies available under the

23   UCL, *Korea Supply Co.*, 29 Cal. 4th at 1144, this alone is fatal to Plaintiffs' demand for restitution

24   against JLI.

25          Separately, the SAC fails to clearly identify what damages it seeks to make the subject of

26   restitution. [SAC ¶ 193 (alleging that Plaintiffs' UCL injuries include "but are not limited to" unpaid

27   compensation).] To the extent Plaintiffs seek to recover money in which they never had an ownership

28   interest or vested interest, *Korea Supply Co.*, 29 Cal. 4th at 1149, Plaintiffs cannot maintain a claim

under the UCL.  For example, the California Supreme Court has held that penalties under Labor Code section 203 are not recoverable as restitution under the UCL.  *Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1401 (2010).  Similarly, Plaintiffs impermissibly seek attorney's fees in connection with their UCL claim [SAC ¶ 195], despite the fact that "attorney fees and damages . . . are not available under the UCL."  *Korea Supply Co.*, 29 Cal. 4th at 1148.  Since Plaintiffs fail to allege a viable form of relief under the UCL, their UCL claim must be dismissed with prejudice.

### E. The Second Amended Complaint Fails to Plausibly Plead Individual or Enterprise Coverage Under the FLSA.

"There are two ways by which employees gain protection under the FLSA. Coverage exists if either (1) the employee is employed with an enterprise engaged in interstate commerce (enterprise coverage), or (2) the employee is himself engaged in interstate commerce (individual coverage)." *Revolorio v. C&R Canoga Park*, No. CV0904572ODWRZX, 2010 WL 11515195, at *3 (C.D. Cal. Jan. 20, 2010).  Plaintiff Bautista-Perez fails to allege sufficient facts to establish either individual or enterprise coverage under the FLSA.

"For enterprise coverage to apply under the FLSA, the enterprise must have (1) employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (2) annual gross volume of sales made or business done [of] not less than $500,000." *Yan v. Gen. Pot, Inc.*, 78 F. Supp. 3d 997, 1003 (N.D. Cal. 2015) (internal quotations omitted) (quoting 29 U.S.C. § 203(s)). "For individual coverage to apply under the FLSA, an employee must have been (1) engaged in commerce or (2) engaged in the production of goods for commerce." *Id.* (internal quotations omitted) (quoting 29 U.S.C. § 207(a)). "The definition for individual coverage [. . .] is not so broad as to include working on goods or materials that have been moved in commerce by any person." *Id.*

Here, Plaintiff fails to allege individual coverage exists as she fails to allege Campaign Workers were engaged in interstate commerce or in the production of goods for interstate commerce.  Rather, Plaintiff alleges she and other Campaign Workers worked out of San Francisco offices and performed phone banking and canvassing activities limited to contacting voters in San Francisco.  [SAC ¶¶ 1, 95, 99, 100, 101, 102, 113.]  Moreover, Plaintiff fails to allege that JLI is an "enterprise" under the FLSA,

JLI'S MOTION TO DISMISS SAC
Case No. 4:20-cv-01613-HSG

instead relying simply on the conclusory allegation that JLI "was, at all times relevant to this Complaint, an employer covered by the FLSA . . ."  [SAC ¶ 16.]  Regardless of JLI's status as an enterprise engaged in commerce, the fact remains that Plaintiff has not -- and cannot -- allege that JLI was *her* employer because JLI did not have sufficient control over the wages, hours, or work conditions of her and other Campaign Workers.

**V.**   **CONCLUSION**

For the foregoing reasons, the SAC fails to allege any conceivable theory of liability with respect to JLI.  The SAC fails to allege that JLI is an employer (whether a direct, joint, or client employer), and further fails to allege that JLI is an alter ego of CRVR.  These deficiencies come on the heels of the Court's express instructions regarding the deficiencies of the FAC and how Plaintiffs needed to cure their complaint.  The SAC fails to cure those deficiencies, and only further underscores the absence of any actionable relationship between JLI and the Campaign Workers.  Accordingly, the SAC should be dismissed in its entirety with prejudice.

Date: February 2, 2021

**FOLEY & LARDNER LLP**
Eileen R. Ridley
Jason Y. Wu
Kaleb N. Berhe

*/s/ Eileen R. Ridley*
Eileen R. Ridley
Attorneys for Defendant JUUL LABS, INC.